B. F. SEGNER et al., Appellants, v. GUARANTY FUND REALTY
COMPANY, Appellee.

CONTRACTS: Requisites and Validity—Memorandum Not Contract. A
1 delivered memorandum containing the general terms of a contem-
plated lease does not constitute an executed contract when the
parties simply intended the memorandum to furnish a basis for
future negotiations.

CONTRACTS: Requisites and Validity—Conditional Delivery. The
2 signing of a writing on behalf of a corporation by the president
thereof and the conditional delivery thereof do not constitute a
contract when it is established that the parties mutually understood
that the writing should be subject to the approval of other officers
of the corporation.

*Appeal from Polk District Court.*—HUBERT UTTERBACK, Judge.

SEPTEMBER 19, 1922.

SUIT for the adjudgment of an instrument to be a valid
lease for 99 years from defendant to plaintiffs of certain prop-
erty, and to compel the specific performance of the leasehold con-
tract.   The court held that plaintiffs had no lease upon or in-
terest in the premises in question, and plaintiffs' petition was
dismissed on its merits, and the title to the real estate was
quieted in the defendant.   Plaintiffs appeal.—*Affirmed.*

*Clark, Byers & Hutchinson* and *Gregory Brunk,* for ap-
pellants.

*Parrish, Cohen & Guthrie,* for appellee.

ARTHUR, J.—I.   Defendant company owned the property
in controversy, Lot 1 of Lots 4 and 5, Block E, in Grimmell's
Addition to the town of Fort Des Moines, now included in the
city of Des Moines, and known as 613-619 West Grand Avenue.
Plaintiff Jenkins owned property immediately west of the above
described property in controversy.   Some time prior to July,

1919, the plaintiff Jenkins entered upon negotiations with officers of the defendant company for a 99-year lease of defendant's property. Jenkins sought to lease the property for himself, individually, and talked with Gerard S. Nollen, secretary of defendant company, about it, and it was decided that Jenkins was not financially strong enough, and that he should get someone who was strong financially, to join with him in the lease; and Jenkins procured plaintiff B. F. Segner to join with him in leasing the property from defendant. A few days prior to July 14, 1919, Gerard S. Nollen gave to Jenkins a memorandum, as follows:

"Memo in re Lot 1 of 4 and 5, Block E, Grimmell's Addition. Rental $9,000 net annually, payable quarterly in advance, beginning August 1, 1919. Option $150,000, end of ten years. Reappraised after ten years, each ten-year period and rental then to be six per cent on appraised value, but not less than $9,000. Will not agree to join in mortgage. Good until next Monday noon, July 14, 1919, subject to agreement as to details of lease."

Following this, negotiations were continued for the formulation of a contract which would be satisfactory to both parties. The first draft of a contract of lease was prepared by E. D. Samson, president of the defendant company, and informally discussed with the members of defendant's board of directors. Some objections were raised as to its provisions. Mr. Samson then rewrote it, so as to obviate what he understood to be the objections. Mr Samson was obliged to immediately go to Chicago, to have his eyes treated, and after rewriting the proposed lease, he attached his signature to it, as president, and acknowledged it before F. H. Noble, a notary public, and delivered it (in duplicate) to Noble, with directions that, when it was approved by Tone, vice president, and Nollen, secretary, and after it had been formally authorized by the board of directors and signed by Nollen, secretary, he should attach his notarial seal, and deliver the lease to Jenkins, for execution by Jenkins and Segner. Before leaving for Chicago, Samson delivered one of the copies to Jenkins, and there is dispute in the evidence as to the purpose for which the copy was delivered to Jenkins. Samson says he let Jenkins have one of the copies, at Jenkins's

request, to show to Segner. Jenkins claims that he received the copy as his copy of the contract, and that he was to show it to Segner, that Segner might know the exact wording of the instrument; and that he and Segner were to come back and meet Nollen, and Segner and Nollen were to sign the instrument and acknowledge it before Noble, notary. Jenkins did not succeed in finding Segner, and called up Nollen, and Nollen told him that Tone was in his office, and that they were talking the matter over, and were dissatisfied, and that they would like to have him come to Nollen's office at 1:30. He says that he went to Nollen's office at 1:30, and found Nollen and Tone there; that they asked him for the copy of the lease which he had; that he did not have it with him, but went after it, and procured it, and turned it over to Nollen. Jenkins says that Nollen then said to him:

"I do not know as there is anything particularly the matter with it. You know we never wanted to sell the thing,—you always came to us; and we will be frank with you,—that is not the only thing, either. Mr. Samson has attended to Mr. Witmer's business for years, and is a personal friend of his, and he has drawn this lease up. We asked him, a time or two, if he did not think we should submit it to some other attorney, and he did not think it was necessary; but now that he has left town, we want to do so, just for our own interests."

Nollen then said that they wanted to show it to Parrish, attorney. Jenkins said to them, "Now look here, gentlemen, do you want this lease for the purpose of throwing out this deal, or anything of that sort?" and they said, "Oh no, no, that is not our intention." Jenkins then said, "All right, I will loan it to you," and handed it to Mr. Nollen, and left the office. Later, Jenkins called on Nollen, and Nollen told him that Mr. Parrish had gone out of town for a few days, and had taken the lease with him, and would read it on the trip, and that he would be ready to talk when Parrish got back. Later, Jenkins called on Nollen for the copy of the lease that he had passed to Nollen, and Nollen refused to give it to him, and told him that no lease had been made. Thereupon, Jenkins took possession of the property, and notified all the tenants that he was taking

possession under a certain lease; that they were entitled to the property on August 1st.

Upon defendant's refusal to proceed further, this suit for specific performance was commenced.

II.  Counsel for appellants argue that the memorandum above set forth constituted an option, which, when accepted by Jenkins, could be specifically enforced.  We think it is suffi-

1. CONTRACTS: requisites and validity: memorandum not contract.

cient on this point to say that the memorandum does not, by its language, purport to be an option contract, but a mere memorandum, as a basis for negotiations for a lease.  The memorandum is not signed by the corporation.  It is signed by Nollen, individually, and no authority is shown for Nollen to act for the corporation.  The memorandum itself provides that the proposition involved was subject to the ability of the parties to agree upon the lease.  We stated the rule on this subject in *Federal Land & Sec. Co. v. Hatch,* 147 Iowa 18.  We think that at no time did the parties to this transaction understand that this memorandum constituted a binding agreement between them, but that all understood it to be a mere basis for negotiations.

III.  We now come to the important and decisive question in the case:  Did the instrument drawn and signed by Samson, president of the defendant company, constitute a binding con-

2. CONTRACTS: requisites and validity: conditional delivery.

tract upon the part of the defendant?

This instrument is in the form of a 99-year lease, containing also an option on the part of the proposed lessees to purchase, and a provision that the lessees should execute a bond, for the purpose of securing the performance of the contract on their part.  The name of the defendant, "Guaranty Fund Realty Company," was typewritten at the end of the instrument, and the blanks were left, so that it might be executed by the signature of the president and attested by the signature and seal of the secretary.  E. D. Samson, the president, signed the instrument under circumstances which we will hereinafter consider.  The instrument was not signed by the secretary or by any other officer of the company.  It was not signed by either of the plaintiffs.

As we understand counsel for plaintiffs, they do not claim that Samson's signature to the lease, as president, would bind

the corporation, but their claim is that there was such a holding out both of Samson and Nollen as the parties who were authorized to bind the corporation that the corporation is now estopped to say that it was not bound.

It is the position of defendant that the signing of the instrument by Samson, as president, did not constitute an execution of the agreement on behalf of the corporation, even if he had intended to accomplish this purpose by such signature. Reference to the company's articles of incorporation with respect to the transaction of its business and the execution of its contracts discloses that the affairs of the corporation "shall be managed and controlled by a board of not less than three nor more than seven members; that such board shall be organized by the election of the president, one or more vice presidents, a secretary, and a treasurer," whose duties shall be such as usually appertain to such offices; that "assignments and indorsements of bonds, mortgages, and other securities in which the corporation shall deal, and cancellation and satisfaction thereof may be executed on behalf of the company, either by the president or one of the vice presidents or by the secretary or by the treasurer. All other contracts and instruments which may be made matters of public record, including conveyance of real estate to be made by this company, may be signed and acknowledged for the company by the president or one of the vice presidents, whose signatures shall be attested by one of the other officers or by a director of the company. Such instruments, when so executed, shall be considered as having been executed upon proper authority."

There are three things to be noted with respect to these provisions of the articles:

(1) The affairs of the corporation are to be managed and controlled by a board of directors.

(2) The duties of the officers of the corporation are such as usually appertain to such offices.

(3) Contracts of the nature under consideration, signed by the president or by a vice president, and attested by another officer or director of the company, are considered to have been executed upon proper authority.

It is clear that the instrument under consideration was not

executed as· provided by the articles of incorporation, in that the signature of the president was not attested by any other officer or director of the company. On this point, as we understand counsel for appellants, they concede that the president or other officer of a corporation could not, merely because he is president or other officer, bind the corporation by signing a lease; but they strenuously insist that, in the instant case, there was such a holding out both of Samson and Nollen as the parties who were authorized to bind the corporation that defendant is now estopped to say that the corporation was not bound. Counsel for appellants insist that the defendant corporation by its conduct gave to Samson, the president, authority to execute this instrument and bind the corporation thereby. It is true, of course, that a corporation, like an individual, may so conduct its affairs that a person dealing in good faith with its officer or agent would be justified in believing that such officer or agent was acting with authority. However, the instrument under consideration showed on its face that it was to be signed and acknowledged both by the president and the secretary, and defendant claims that Jenkins was advised that it was necessary to have the execution of the lease authorized by the board of directors. On this subject, Jenkins testified:

"Tuesday, Mr. Nollen, Mr. Tone, and Mr. Samson met at Mr. Samson's office. They suggested some changes. They were agreed upon, and Mr. Samson said he would rewrite it, and we would meet again the next morning at 9 :30; that he would have to go out to Mr. Nollen's house in the morning, and get the folks together, and get the proper authorization, and have a conversation, before he would be prepared to sign up. Before Mr. Samson signed this lease, as president of the corporation, he told me that he was to have a meeting of the directors the next morning, to authorize an execution of the lease. Previous to that, he had told me that I could not put my initials on, because the matter was not authorized, and was not in form."

Speaking of what occurred the morning Mr. Samson signed the instrument and left for Chicago, Mr. Jenkins testified:

"I was unable to locate Mr. Segner again. He was out on a job all around the city. I called Mr. Samson and told him I was unable to locate him. Mr. Samson said that he had to go

that day, on account of his eyes had to be attended to at Chicago, and said I better come down myself. Mr. Samson said it was all fixed up and ready; that he had to get out of town; that, if I didn't get Mr. Segner, he wouldn't know what to do: and I suggested that maybe I could make arrangements with the rest of them so that he could sign up and go ahead and take his vacation.''

It would seem from Jenkins's own testimony that it was his understanding that, before the contract would be completed, he must get the approval of Mr. Segner to the instrument as drawn, and also ''make arrangements with the rest of them.'' Clearly, from his own testimony, Jenkins did not consider the contract agreed to and completed when Samson, president, alone had signed it. When he spoke of ''arrangements with the rest of them,'' he could not have understood and meant anything else, it seems to us, than the approval of the board of directors of the defendant company and an attesting signature to the instrument, as provided by the articles of incorporation. Under this record, there is no merit in the claim that Jenkins in good faith relied upon the authority of Samson, president, to execute this instrument, without authority of the board of directors; and there is no claim that any such authorization was given. The record of all the proceedings of the company covering the period under investigation was introduced in evidence, and does not contain authorization for making the lease.

It is argued by counsel for appellants that, after Samson, president, signed the instrument, he delivered it, and gave Jenkins one copy; and that it was not only a completed contract, but was thereby delivered. The record does not support the position of appellants that there was a delivery of the contract. Mr. Samson testified with respect to the transaction by which Jenkins got possession of one of the copies which he had signed, as follows:

''The morning passed, and we didn't reach any of them; and Mr. Jenkins came to my office. I took out the incorrect page and put in the correct page. He put his initials on the copy which he had in his possession, with that substituted page. I said there was no reason why he should not have that copy when the lease should be completed. I was determined to leave

that morning, and to make it possible, I wrote my name, as president of the company, to both duplicates, and affixed the corporate seal, as it was then on my table, and took them in to Mr. Noble, whose office adjoins mine. Told him I was going away, and Mr. Nollen and Mr. Tone would come in and see about that lease that I had signed; that they might go ahead and complete the contract, if that pleased the directors when it should be brought to their notice, expecting that they would come and examine the contract, and if they found it satisfactory, Mr. Nollen would sign, and Mr. Segner and Mr. Jenkins would sign it, and the copies would be exchanged or delivered. Mr. Jenkins asked me to make up another copy of the proposed lease, that he might let Mr. Segner read it. I told him that it was a twenty-page document, and that the pages were in confusion; that I had no time to correct the several pages and get them into form. I said, 'Take this, and let him read it.' I just loaned it to him; did not attempt to deliver it to him. It was one of the duplicate copies which I had signed.''

With respect to this same transaction, Mr. Jenkins testified:

''After Mr. Samson came out of Mr. Noble's office, I told him that Mr. Segner understood the bond clause,—that I would like to take one of the copies over and show him the exact wording of it. He let me take my copy. By then, he had glued and clipped the two leases, and told me to put my identification initials on them, and signed them himself. He allowed me to take my copy, to show to Mr. Segner. It had my initials on. He said: 'You take this and show to Ben [Segner], and then you and Ben come back at 11 o'clock, and meet Mr. Nollen, for the signature and acknowledgment by Mr. Noble.' I think it was the next day that I got Exhibit G [the lease], for the purpose of showing it to Mr. Segner with respect to the bond. I told Mr. Samson that that was what I wanted it for.''

We must conclude that neither Samson nor Jenkins understood that the contract was consummated when Samson signed it and gave one copy to Jenkins, to be shown to Segner. Samson testified directly that it was not his understanding that the contract was completed. We think that the testimony of Mr. Jenkins shows that it was not his understanding that the contract was completed when Samson, president, signed it. We

think it clearly appears that the purpose of Samson in signing the instrument as president was to put it in shape so that, if it was approved by the directors, and properly attested, the transaction could be completed in his absence; and that this was done at the suggestion of Mr. Jenkins. The purpose of delivering the copy to Jenkins was that he might show it to Segner, and have him approve it. If Samson and Jenkins had considered the contract consummated, it would seem that Jenkins would then and there have signed it. But neither Jenkins nor Segner signed the contract. Jenkins claimed to have full authority from Segner to agree to the contract for him, but Segner seems never to have personally even read the contract. Segner testified:

"I was at Samson's office once for about 30 minutes. They had something then they were talking over, and I suppose it was the lease; but I never read it over, never saw it, and never saw a draft of it until Exhibit G [the lease] was put in my hands. Have never read it over."

Moreover, it is apparent from Mr. Segner's testimony that he did not expect to devote any time or attention to carrying out the contract, if it were completed, but simply intended to sign the contract as an accommodation for Jenkins, for which service he was to receive the sum of $1,000. If for no other reason, the defendant was justified in not being willing to consummate a contract of such importance with a man who took no more interest in it than did Segner.

We arrive at the conclusion that the minds of the parties to this proposed contract never met and agreed on a final and completed contract; that the instrument in question was never authorized by the defendant; that it was never executed by the defendant, and was never delivered; and that appellants were not entitled to specific performance.

The decree and judgment of the court below is affirmed.—*Affirmed.*

STEVENS, C. J., EVANS and FAVILLE, JJ., concur.